UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SNOQUALMIE INDIAN TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF WASHINGTON, et al.,<br><br>Defendant. | CASE NO. 3:19-CV-06227-RBL<br><br>ORDER GRANTING DEFENDANT STATE OF WASHINGTON'S MOTION TO DISMISS AND DENYING PENDING MOTIONS AS MOOT<br><br>DKT. ## 17, 26, 28, 29 |

## INTRODUCTION

THIS MATTER is before the Court on Defendants State of Washington, Governor Jay Inslee, and Washington Department of Fish & Wildlife Director Kelly Susewind's Motion to Dismiss under Rule 12(c). Dkt. # 29. In 1855, members of several Washington tribes signed the Treaty of Point Elliott, which ceded Indian-owned land in exchange for various rights. Plaintiff Snoqualmie Indian Tribe claims it is a signatory to the Treaty and therefore holds hunting and gathering rights under it. Complaint, Dkt. # 1, at 6-8. However, a previous case adjudicating fishing rights found that the Snoqualmie Tribe was not a successor in interest to the Treaty signatories because it had not maintained an organized structure since 1855. *See United States v. State of Wash.*, 476 F. Supp. 1101, 1104 (W.D. Wash. 1979), *aff'd*, 641 F.2d 1368 (9th Cir.

1981). The State now moves to dismiss by arguing, among other things, that this prior determination precludes the Snoqualmie's claims in this case. The Court agrees and GRANTS the State's Motion. All other pending motions are DENIED AS MOOT.

## BACKGROUND

**1. The Snoqualmie Tribe's Allegations regarding its Rights under the Treaty of Point Elliott**

The Snoqualmie Tribe is a federally-recognized Native American tribe with a reservation near Snoqualmie, Washington. Complaint, Dkt. # 1, at 2. For generations, the Snoqualmie people have engaged in hunting and gathering to sustain themselves. *Id*. at 3. The Snoqualmie currently regulate hunting and gathering pursuant to tribal code. *Id*. at 2.

In 1854 and 1855, the United States and a number of tribes executed treaties known as the "Stevens Treaties" in which tribes relinquished their claims to most territory in Washington State but reserved certain rights for themselves. *Id*. at 3-4. One of these treaties was the Treaty of Point Elliott, Article V of which stated:

> The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens.

*Id*. at 4.

The Snoqualmie Tribe alleges that it is a signatory to the Treaty of Point Elliott through several members of the "winter villages" that made up the Tribe in 1855, including Chief Pat Kanim. *Id*. The Snoqualmie correctly point out that the Bureau of Indian Affairs (BIA) acknowledged the Tribe's participation in the Treaty of Point Elliott when approving its petition for federal recognition in 1997. *See Final Determination To Acknowledge the Snoqualmie Tribal*

*Organization*, 62 Fed. Reg. 45864-02, 45865 (1997) ("The Snoqualmie tribe was acknowledged by the Treaty of Point Elliott in 1855 and continued to be acknowledged after that point.").

The Washington Department of Fish and Wildlife (WDFW) provides a process by which Native American tribes who are signatories to the Stevens Treaties can obtain traditional area hunting designations from the State. *Id*. at 5. In 2019, WDFW informed tribes who were signatories to the Stevens Treaties that WDFW intended to update its procedures for evaluating tribes' asserted hunting and gathering rights, but the Snoqualmie were not contacted. *Id.* at 5. The Snoqualmie reached out to WDFW with evidence of their treaty status, but WDFW responded with a letter stating that "the Snoqualmie Tribe does not have off-reservation hunting and fishing rights under the Treaty of Point Elliott." *Id*. at 6.

After another attempt to resolve the issue, the Snoqualmie sued the State on December 20, 2019. Their Complaint seeks a declaration that the Snoqualmie Tribe has "maintained a continuous organized structure" since its members signed the Treaty of Point Elliott in 1855, making the present Tribe a signatory. *Id*. at 6, 8. The Snoqualmie thus ask that the Court recognize their hunting and gathering rights under Article V of the Treaty and order the State to treat the Snoqualmie equally with other signatory tribes. *Id*. at 7-9.

**2.      Judge Boldt's Determination of the Snoqualmie's Treaty Status in *Washington II***

This is not the first time a court has evaluated the Snoqualmie's rights under the Treaty of Point Elliott. In 1974, Judge Boldt issued a decision granting fishing rights to fourteen tribes that were signatories to the Stevens Treaties. *See United States v. Washington*, 384 F. Supp. 312, 406 (W.D. Wash. 1974) (*Washington I*). The Snoqualmie were not included. Later that year, the Snoqualmie and four other tribes intervened in the case, arguing that they were also signatories to the Stevens Treaties and entitled to fishing rights. *United States v. State of Wash.*, 98 F.3d

1159, 1161 (9th Cir. 1996) (recounting history of 1970's proceedings). Judge Boldt referred the matter to Magistrate Judge Robert Cooper, who determined that the five tribes had no rights under the Stevens Treaties because they had not maintained political cohesion since 1855. *Id*.

The Snoqualmie (along with the four other tribes) objected to Judge Cooper's report and recommendation, and Judge Boldt held a three-day de novo evidentiary hearing. *Id*. However, Judge Boldt ultimately agreed with Judge Cooper, concluding that the Snoqualmie had "not lived as a continuous separate, distinct and cohesive Indian cultural or political community" and "not maintained an organized tribal structure in a political sense." *United States v. State of Wash.*, 476 F. Supp. 1101, 1109 (W.D. Wash. 1979) (*Washington II*). Consequently, Judge Boldt held that the Snoqualmie Tribe was "not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Point Elliott" and had no fishing rights as a result. *Id*.

The Snoqualmie appealed, but the Ninth Circuit affirmed the district court's decision. *United States v. Washington*, 641 F.2d 1368 (9th Cir. 1981). The court noted that, because Judge Boldt had adopted much of the United States' proposed findings of fact, it would apply "close scrutiny" to the lower court's decision. *Id*. at 1371. Although the Ninth Circuit rejected Judge Boldt's statement that tribal treaty rights were contingent on federal recognition, it nonetheless held that the record supported the district court's outcome. *Id*. at 1372. The court explained that there is "a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure." *Id*. (citing *United States v. State of Wash.*, 520 F.2d 676, 693 (9th Cir. 1975)). The court held that the Snoqualmie did not meet this requirement, citing a lack of government control of tribal members, absence of "continuous informal cultural influence," intermarriage with non-Indians, and settlement in non-Indian residential areas. *Id*. at 1373-74. The tribes appealed to the

Supreme Court but were denied certiorari. *Duwamish, Samish, Snohomish, Snoqualmie & Steilacoom Indian Tribes v. Washington*, 454 U.S. 1143 (1982).

Although the panel upheld Judge Boldt's decision in *Washington II*, Judge Canby wrote in dissent that Judge Boldt's erroneous belief that federal recognition was necessary for treaty rights had "permeated the entire factual inquiry." 641 F.2d at 1375. Specifically, Judge Canby explained that Judge Boldt's factual determinations were designed to meet a "more stringent requirement" derived from the BIA's federal recognition standard, rather than "the proper requirement that 'some defining characteristic of the original tribes persist in an evolving tribal community.'" *Id*. (quoting majority opinion). The dissent therefore concluded that a new factual determination was warranted. *Id*.

**3.     The Impact of *Washington II***

Judge Boldt's decision in *Washington II* and the Ninth Circuit's affirmation have cast a long shadow. In *Greene v. United States*, 996 F.2d 973 (9th Cir. 1993), the Tulalip Tribe attempted to intervene in the Samish Tribe's federal recognition proceedings by arguing that federal recognition of the Samish could undermine the finality of *Washington II*. The Ninth Circuit rejected this because federal recognition "serves a different legal purpose and has an independent legal effect" and "is not a threshold condition a tribe must establish to fish under the Treaty of Point Elliott." *Id*. at 976-77. The Tulalip then tried to argue that the Samish's petition for recognition was precluded by the factual determination in *Washington II*, but the Ninth Circuit was similarly unpersuaded that the rights at issue in that case had any impact on recognition proceedings before the BIA. *Greene v. Babbitt*, 64 F.3d 1266, 1271 (9th Cir. 1995).

There have also been several unsuccessful attempts to reopen Judge Boldt's decision in *Washington II*. In 1996, the Ninth Circuit rejected a motion by the Duwamish, Snohomish, and

Steilacoom Tribes to reopen the case based on allegations that Judge Boldt was suffering from Alzheimer's Disease at the time of his ruling. *United States v. State of Wash.*, 98 F.3d 1159, 1163 (9th Cir. 1996) (*Washington III*). According to the court, the tribes' evidence that Judge Boldt had been an incompetent factfinder, which consisted only of his death certificate and a *Seattle Post-Intelligencer* article, did not cast doubt on the 1979 case's outcome. *Id*.

Then, in 2002, the Samish Tribe moved to reopen *Washington II* based on the tribe's successful application for federal recognition. *United States v. Washington*, 394 F.3d 1152, 1156 (9th Cir. 2005). After multiple appeals, an en banc Ninth Circuit panel affirmed the district court's denial of the motion. *United States v. Washington*, 593 F.3d 790, 793 (9th Cir. 2010) (*Washington IV*). In a decision written by Judge Canby, the court concluded that its holding in *Greene* was a "two-way street: treaty adjudications have no estoppel effect on recognition proceedings, and recognition has no preclusive effect on treaty rights litigation." *Id*. at 800. Consequently, although the Samish's federal recognition was likely based on findings inconsistent with *Washington II*, that did not justify "undoing the finality of the *Washington II* factual determinations." *Id*. That said, the court pointed out that nothing in its holding "precludes a newly recognized tribe from attempting to intervene in *United States v. Washington* or other treaty rights litigation to present a claim of treaty rights not yet adjudicated." *Id*. at 801.

**DISCUSSION**

Although the effects of Judge Boldt's 1979 decision have been thoroughly litigated, this case presents a new question: does the determination in *Washington II* that the Snoqualmie have no fishing rights under the Treaty of Point Elliott preclude a finding that the Tribe has hunting and gathering rights? Issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even

if the issue recurs in the context of a different claim." *Garity v. APWU Nat'l Labor Org.*, 828 F.3d 848, 858 n.8 (9th Cir. 2016) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). The doctrine applies if: "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom [issue preclusion] is asserted was a party or in privity with a party at the first proceeding." *Id*. at 858 n.8.

Here, the second and third elements are clearly met; the Snoqualmie are the same tribal entity that intervened in *Washington II*, and the Ninth Circuit's decision affirming the district court was a final judgment on the merits. This is no less true simply because the judgment concerned fishing rights. Issue preclusion only requires that the issue decided was essential to a final judgment about *something*; the relevant issue may be broader than the claim that was adjudicated. *See Sturgell*, 553 U.S. at 892. Otherwise, issue and claim preclusion would be the same.

The parties mainly dispute the first element. The State argues that the Snoqualmie's claims are barred because, although the *Washington* line of cases concern fishing rights and not hunting and gathering, the decisive question of tribal continuity since treaty execution precedes the possibility of *any* treaty rights. The Snoqualmie resist this conclusion, emphasizing that *Washington II* did not extend beyond fishing rights. The Snoqualmie also assert that the factual issues in *Washington II* were different than the current case because of Judge Boldt's erroneous focus on federal recognition. Finally, if issue preclusion would normally apply, the Snoqualmie contend that the Court should make an exception here and allow their claims to go forward.

**1.     Identity of Issues**

Despite the Snoqualmie's novel claims, the factual issue that determined the Tribe's fishing rights in *Washington II* is the same gateway question that the Court would face here when determining hunting and gathering rights under the Treaty of Point Elliott. The type of rights sought is a distinction without a difference. The Ninth Circuit's decision affirming *Washington II* unequivocally addressed the "single condition" necessary for determining whether a "group asserting treaty rights [is the same] as the group named in the treaty[:]" maintenance of an organized tribal structure. 641 F.3d at 1372. The Snoqualmie do not explain how the factual issues necessary to determine signatory status with respect to fishing rights could differ from those required to determine hunting and gathering rights, all of which are described in the same article of the Treaty. This is because they do not differ; as the Ninth Circuit recognized, both issues hinge on the same question of identity between the original signatories and the present-day tribe. *See id*. at 1372.

The Snoqualmie insist that Judge Boldt and subsequent courts explicitly limited the *Washington* line of cases to fishing rights. *See, e.g., Goldmark*, 994 F. Supp. 2d at 1174 (noting that "the scope of the hunting and gathering provision has not been previously litigated in federal court"); *Skokmish Indian Tribe v. Forsman*, 738 Fed. Appx. 406, 408 (9th Cir. 2018) ("No plausible reading" of the *U.S. v. Washington* litigation "supports the conclusion that [it] decided anything other than treaty fishing rights."). But while *Washington II* does not determine the scope of hunting and gathering rights, this says nothing about whether tribes that lack fishing rights because they lack successorship to any treaty signatories could nonetheless have other treaty rights. The Ninth Circuit's broad holding implicitly answers that question in the negative.

641 F.3d at 1372. As for Judge Boldt's statements, his focus on fishing rights does not change the implications of his factual finding.

Finally, the Snoqualmie's argument that this case raises new factual issues because Judge Boldt focused on federal recognition simply repeats the position from Judge Canby's dissent. *See id.* at 1375. If this could carry the day, the Snoqualmie and the other four intervening tribes from *Washington II* may possess *all* the rights from the Stevens Treaties, including fishing. But unfortunately for the Snoqualmie, Judge Canby's dissent was only a dissent; the majority addressed Judge Boldt's erroneous focus on recognition but still affirmed his factual determination based on the record. *Id*. at 1373. Because that determination is imperative for all treaty rights, including hunting and gathering, the requirements for issue preclusion are met.

**2.     Exceptions to Issue Preclusion**

If issue preclusion applies, the Snoqualmie argue that the Tribe's federal recognition in 1997 justifies an exception. They specifically point to two exceptions described in Section 28 of the *Restatement (Second) of Judgments*: one that applies if the "issue is one of law" and there has been an "an intervening change in the applicable legal context," and a second that is relevant when there are "differences in the quality or extensiveness of the procedures followed in the two courts." Courts may, for example, circumvent issue preclusion if the decisive legal principle in the former case was overturned. *See Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979). The second exception is used more rarely, but one court applied it where the relevant issue was previously decided in small claims court, which lacks many procedural protections. *Clusiau v. Clusiau Enterprises, Inc.*, 225 Ariz. 247, 251 (Ct. App. 2010). On the other hand, the mere fact that the issue was previously decided in state rather than federal court does not

demonstrate inadequate procedures. *See Gilbert v. Constitution State Serv.*, Co., 101 F. Supp. 2d 782, 787 (S.D. Iowa 2000).

Here, these exceptions can only apply if: (1) the Ninth Circuit used the wrong standard in affirming *Washington II*, or (2) the Snoqualmie can demonstrate qualitative defects in the proceedings surrounding Judge Boldt's decision. Neither of these are the case. There is no indication that the standard requiring maintenance of an organized tribal structure has been overruled or altered since the decision upholding *Washington II*. Rather, courts have continued to apply it. *See, e.g., Robinson v. Salazar*, 838 F. Supp. 2d 1006, 1033 (E.D. Cal. 2012); *United States v. Confederated Tribes of Colville Indian Reservation*, 606 F.3d 698, 706 (9th Cir. 2010). The Snoqualmie also suggest that their federal recognition in 1997 creates a new legal context, but this is incorrect. Nothing about federal recognition constitutes a "change or development in the controlling legal principles" for determining treaty status. *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591 (1948).

Federal recognition does, of course, cast different light on the determination in *Washington II* that the Snoqualmie have not maintained an organized tribal structure since 1855. The BIA's Proposed Finding, which was largely adopted in the Final Determination regarding recognition, concluded that the Snoqualmie maintained a distinct political and cultural community from 1855 onward. *Proposed Finding for Federal Acknowledgment of the Snoqualmie Indian Tribe*, 58 Fed. Reg. 27162-01, 27163 (1993); *see also Final Determination*, 62 Fed. Reg. at 45865.

But the fact that the BIA reached a different conclusion about the Snoqualmie's political continuity does not mean the proceedings in *Washington II* were inadequate. As multiple courts have observed, the five intervening tribes had an opportunity to argue their positions and present

evidence during hearings before Magistrate Judge Cooper, a three-day de novo hearing before Judge Boldt, and finally a hearing before the Ninth Circuit. *See Washington III*, 98 F.3d 1159 at 1161; *Washington IV*, 593 F.3d at 799. The Snoqualmie do not identify any specific facts that were not and could not have been presented in those prior proceedings. Indeed, as was true for the Samish, the Snoqualmie Tribe had every "incentive to present in *Washington II* all of its evidence supporting its right to successor treaty status." *Washington IV*, 593 F.3d at 799.

While the inconsistency between *Washington II* and the BIA's findings is disconcerting, that alone is not enough to dispense with issue preclusion. The Snoqualmie point out that Judge Boldt made several comments in his decision suggesting that it was temporally-limited and could change with a successful application for federal recognition. *See Washington II*, 476 F. Supp. at 1111 (concluding that the tribes were not political successors to the treaty signatories "at this time"). The Tribe also interprets the Ninth Circuit's observation in *Washington IV* that "a newly recognized tribe [is not precluded from] present[ing] a claim of treaty rights not yet adjudicated" as suggesting that issue preclusion should not apply if a tribe seeks a treaty right other than fishing. 593 F.3d at 801. But Judge Boldt's statements limiting his holding were premised on his belief that recognition status was dispositive. The reviewing panel that disabused him of that notion did not mention temporal limitations. And while the Ninth Circuit's statement in *Washington IV* invites litigation from tribes that have not sought treaty rights in the past, it does not apply to tribes like the Snoqualmie that *have* adjudicated the essential issue for determining treaty status.

The Ninth Circuit has made it clear that "treaty litigation and recognition proceedings [are] 'fundamentally different' and [have] no effect on one another." *Id*. at 800 (quoting *Greene*, 64 F.3d at 1270). While this statement was made in the context of reopening *Washington II*, its

logic applies equally to issue preclusion. Judge Boldt's decision, as affirmed by the Ninth Circuit, was a final judgment concluding that the Snoqualmie are not political successors to the Treaty of Point Elliott signatories. That issue is dispositive for all claims in this case.

## CONCLUSION

Because the factual issue at the heart of the Snoqualmie's claims has been resolved against them in a previous proceeding, this case must be DISMISSED with prejudice. The State's Motion is GRANTED, and all other pending motions are DENIED AS MOOT.

IT IS SO ORDERED.

Dated this 18th day of March, 2020.

_____
Ronald B. Leighton
United States District Judge